A08A0330. A & S GROUP, INC. v. MURRAY.
(661 SE2d 701)

MIKELL, Judge.

John A. Murray sued O. Sami Durukan, Apel Dido, and A & S Group, Inc., seeking to recover unpaid salary, expenses, and commissions under his employment contract. Following a bench trial, the trial court dismissed the complaint as to Durukan and Dido, and awarded Murray $24,933.92 on his claims against A & S Group for unreimbursed expenses and commissions. A & S Group appeals, contending that there was no evidence to support the trial court's findings as to either liability or damages. We disagree and affirm for the reasons set forth below.

---

Viewed in a light most favorable to the trial court's judgment,[1] the evidence shows that on November 30, 2000, Murray accepted a written offer of employment from "Architectural Craftsmen a Division of A & S Group." Murray's duties were described as "[e]stimating, [e]ngineering, and design, cut ticket and shop drawing, management of projects and all aspects that accompany." The employment contract was signed on behalf of the employer by Cheryl Montour, and below her signature was printed: "Architectural Craftsmen, a Division of A & S Group."

In addition to his salary, Architectural Craftsmen agreed to pay Murray one percent of its net profits on projects he managed directly during the first year of his employment, and two percent of the net profits on such projects thereafter. Architectural Craftsmen agreed to pay his job-related expenses. On the day that he was hired, Murray met with Durukan, who was co-owner with Dido of A & S Group, at A & S Group's corporate offices. Durukan reviewed the terms of the employment contract, and, according to Murray, Durukan "was quite pleased."

In addition to the employment contract describing Architectural Craftsmen as a division of A & S Group, a project proposal from Architectural Craftsmen to a prospective client was admitted into evidence. The proposal, which appears to be on printed stationery, shows "Architectural Craftsmen a Division of A & S Group, Inc.," and the address at the bottom is the same street address as A & S Group's offices. Murray testified that he received one or two paychecks directly from A & S Group in the early stages of his employment but that the name listed on the majority of his paychecks was Denimland. Murray understood that Denimland was also a division of A & S Group.

Murray worked and was paid in accordance with the employment agreement without receipt of his commissions because final payments on most of the projects Murray managed were not made until 2003. Murray was terminated in July 2003, and the following month he wrote to Durukan and Dido demanding payment for his unpaid expenses and for commissions due him for work on seven projects. There is no evidence that Durukan or Dido replied to the demand letter.

Notwithstanding Murray's testimony, A & S Group presented evidence tending to show that Murray was not employed by A & S Group or a division thereof. Durukan testified that Architectural Craftsmen was a division of Denimland, Inc. and not A & S Group.

---

[1] *Plaza Properties v. Prime Business Investments*, 240 Ga. App. 639, 640 (2) (524 SE2d 306) (1999).

According to Durukan, Denimland was owned by a Turkish national named Huesyn Cak. Durukan helped Cak set up Denimland, and for a time Denimland and A & S Group shared office space. Durukan performed work for Denimland, but did not have any ownership interest in the company. Durukan maintained that he hired Montour to manage Architectural Craftsmen on behalf of Denimland, but Montour was not on A & S Group's payroll. Durukan claimed he never saw Murray's employment contract.

Dido testified that Murray never received a paycheck from A & S Group. Rather, to Dido's knowledge, Murray and Montour worked for Denimland. According to Dido, he never gave Montour the authority to sign any documents on behalf of A & S Group. Dido denied ever seeing a document with "Architectural Craftsmen a Division of A & S Group" written on it.

1. A & S Group claims that the trial court erred in finding it liable to Murray under the employment contract because, among other things, there was no evidence showing that Montour had authority to act for the corporation. We disagree. "In a bench trial, the trial court's findings will be upheld on appeal when there is any evidence to support them."[2] There was at least some evidence to support the conclusion that, even if Montour was not authorized to execute the employment contract on behalf of A & S Group, A & S Group ratified the agreement.

"The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf."[3] "A ratification by the principal shall relate back to the act ratified and shall take effect as if originally authorized. A ratification may be express or implied from the acts or silence of the principal. A ratification once made may not be revoked."[4] Whether a ratification has occurred is usually a question for the trier of fact.[5]

Evidence shows that on the same day that Montour signed the employment contract, Murray met with Durukan in the offices of A & S Group. According to Murray, Durukan "had [the contract] right here and went through it. He was quite pleased." Thus, in Murray's presence, the co-owner of A & S Group reviewed and appeared to be pleased with an employment contract in which A & S Group purported to hire Murray to work in one of its unincorporated divisions. Pretermitting whether the foregoing is evidence of express

---

[2] (Citation and footnote omitted.) *Hayes v. Alexander*, 264 Ga. App. 815-816 (592 SE2d 465) (2003).

[3] OCGA § 10-6-1.

[4] OCGA § 10-6-52.

[5] *Wielgorecki v. White*, 133 Ga. App. 834, 838 (1) (212 SE2d 480) (1975).

ratification, Durukan's continuing silence under the circumstances could be construed as a ratification of the contract by A & S Group. "If, after knowledge of what the agent has done, the principal makes no objection for an unreasonable time, a ratification results by operation of law. Generally, the question of what is an unreasonable period of time is one for the jury."[6] The trial court was authorized to conclude that, notwithstanding his testimony to the contrary, Durukan, and therefore A & S Group, had full knowledge that Murray's employment contract was signed on behalf of A & S Group by Montour; that Durukan allowed Murray to begin and continue work under the reasonable impression that he had an employment contract with A & S Group; and that A & S Group failed to object to the contract within a reasonable time, thus ratifying the agreement.[7] We note that although A & S Group claims that Murray was hired by Denimland, the name of this company does not appear in the employment contract. Evidence also showed that Murray received at least two paychecks directly from A & S Group. The trial court did not err in finding A & S Group bound by the employment contract.

2. Alternatively, A & S Group contends that, even if liability exists, the trial court erred in awarding Murray damages for commissions and expenses. Again, we disagree.

Murray testified at trial that he had based his $17,970 claim for commissions based on a percentage of net profits as set forth in the employment contract and from his knowledge of the contract amounts and the job cost summary reports he received weekly as the project manager. The breakdown of the net profits claimed by Murray as to the specific projects on which he worked, the contract year in which the work was performed, and the method for calculating the commissions was detailed in the demand letter from Murray to Durukan and Dido, which was admitted into evidence. Murray also claimed $6,963.92 in expenses, the sum of three expense reports he had prepared and submitted for "traveling, . . . [and] purchas[ing] several items on my own funds to finish up jobs, manage jobs, or run the jobs." The written job cost summary and expense reports were not submitted into evidence. A & S Group did not object to Murray's testimony.

"On appellate review of a bench trial, we must affirm the court's award of damages if there is any evidence showing with reasonable

---

[6] (Citations omitted.) *Klingbeil v. Renbaum*, 146 Ga. App. 591, 593 (3) (246 SE2d 698) (1978).

[7] See id. at 592-593 (1) ("[a] principal may by ratification or by failure to repudiate acts of his alleged agent become bound") (citations omitted).

certainty the amount of damages."[8] A & S Group maintains that there was no evidentiary basis for a damage award, but Murray testified based on his personal knowledge of his own reimbursable costs and of project contract amounts and associated expenses, and so there was at least some evidence for the trial court to calculate damages with reasonable certainty.[9] Accordingly, we cannot conclude that the trial court erred in its damage award.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED MAY 1, 2008.

*Robert W. Hughes, Jr.*, for appellant.
*Rodney Q. Quarles*, for appellee.

A08A0422, A08A0424. McLAINE et al. v. McLEOD et al. (two cases).
A08A0423, A08A0427. REGISTER et al. v. McLEOD et al.
(two cases).
A08A0425, A08A0426. REGISTER v. McLEOD et al. (two cases).
(661 SE2d 695)

ELLINGTON, Judge.

These cases arose when a tractor-trailer driven by Johnny Moody struck a pickup truck driven by Jimmy McLaine, which forced McLaine's truck into a tractor being driven by Bradford Register. The collisions resulted in the deaths of McLaine, his five-year-old daughter, May Angelyne ("Macy"), and Register's two-year-old son, Brance. Register and his five-year-old son, Brennen, were critically injured. The injured individuals, as well as the families of the deceased and injured (hereinafter, collectively referred to as "the plaintiffs"), filed wrongful death and personal injury

---

[8] (Footnote omitted.) *Cannon Air Transport Svcs. v. Stevens Aviation, Inc.*, 249 Ga. App. 514, 518 (5) (548 SE2d 485) (2001).

[9] See id. (testimony of vice-president of finance, who was personally familiar with invoices, as to amounts outstanding was sufficient to show that award on counterclaim was within the range of the evidence). Compare *Ga. Power Co. v. Maxwell*, 169 Ga. App. 324, 326-327 (3) (312 SE2d 645) (1983) (as there was no evidence as to plaintiff's life expectancy, damages in suit to recover pension benefits could not be calculated with reasonable certainty); *Bennett v. Associated Food Stores*, 118 Ga. App. 711, 714-718 (2) (165 SE2d 581) (1968) (where plaintiff admitted to destroying relevant cost records prior to trial and testified that he had no idea of how much profit or loss he would have made if the contract had been performed, damage award for breach of contract was not authorized by the evidence).